# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

Case No. _____20-MJ-03723-EGT_____

UNITED STATES OF AMERICA

v.

DIAMOND BLUE SMITH,

Defendant.
_____/

## CRIMINAL COVER SHEET

1. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to August 9, 2013 (Mag. Judge Alicia Valle)?    ___ Yes  ✓ No

2. Did this matter originate from a matter pending in the Northern Region of the United States Attorney's Office prior to August 8, 2014 (Mag. Judge Shaniek Maynard)?    ___ Yes  ✓ No

3. Did this matter originate from a matter pending in the Central Region of the United States Attorney's Office prior to October 3, 2019 (Mag. Judge Jared Strauss)?    ___ Yes  ✓ No

Respectfully submitted,

ARIANA FAJARDO ORSHAN
UNITED STATES ATTORNEY

BY:   *Aimee C. Jimenez*
_____
AIMEE C. JIMENEZ
ASSISTANT UNITED STATES ATTORNEY
District Court No. A5500795
99 N.E. 4th Street
Miami, Florida 33132
Tel:      305-961-9028
Fax:      305-530-7976
Email:    aimee.jimenez@usdoj.gov

AO 91 (Rev. 08/09)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the

Southern District of Florida

| United States of America | ) | |
|---|---|---|
| v. | ) | Case No. |
| Diamond Blue Smith, | ) | 20-MJ-03723-EGT |
| | ) | |
| | ) | |
| | ) | |

*Defendant(s)*

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of ___May 13 - August 24, 2020___ in the counties of ___Miami-Dade and Broward___ in the

___Southern___ District of ___Florida___ , the defendant(s) violated:

| *Code Section* | *Offense Description* |
|---|---|
| 18 U.S.C. Sec. 1343 and 2 | Wire Fraud |
| 18 U.S.C. Sec. 1344 and 2 | Bank Fraud |
| 18 U.S.C. Sec. 1349 | Conspiracy/Attempt to Commit Wire Fraud and Bank Fraud |

This criminal complaint is based on these facts:

SEE ATTACHED AFFIDAVIT.

☑ Continued on the attached sheet.

*Complainant's signature*

ID #6335

Warren E. Rogers, Jr., Special Agent, IRS-CI
*Printed name and title*

Attested to by the Applicant in accordance with the requirements of Fed.R.Crim.P. 4.1 by telephone.

Date: 9-30-2020

*Judge's signature*

City and state: ___Miami, Florida___

Edwin G. Torres, U.S. Magistrate Judge
*Printed name and title*

## AFFIDAVIT

I, Warren E. Rogers, Jr., being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.      I make this Affidavit in support of a criminal complaint charging DIAMOND BLUE SMITH ("SMITH" or "Defendant"), with wire fraud, bank fraud, attempt and conspiracy to commit wire fraud and bank fraud, in violation of 18 U.S.C. §§ 1343, 1344, 1349, and 2, from on or about May 13, 2020, to at least on or about August 24, 2020, in the Southern District of Florida, and elsewhere (the "Target Offenses").

2.      Defendant has participated in a scheme to obtain by fraud millions of dollars in forgivable loans through the Paycheck Protection Program ("PPP") and other government programs, conspiring with a person now cooperating with the investigation ("CHS 2") and others. Defendant obtained two fraudulent PPP loans for his own companies, Throwbackjerseys.com, LLC ("Throwbackjerseys.com"), and Blue Star Records, LLC ("Blue Star Records"), with CHS 2 providing falsified documents and submitting the applications on Defendant's behalf in exchange for a kickback from the loan proceeds. Defendant also conspired to submit additional fraudulent PPP loan applications for other companies by recruiting other confederate loan applicants in order to receive kickbacks from those confederates. To inflate the size of these PPP loans, and the corresponding kickbacks, the conspirators relied on a variety of false statements, including by submitting falsified bank statements and payroll tax forms. For example, the conspirators used nearly identical versions of the same fabricated bank statements, recycled in the PPP applications for multiple companies with minor changes.

3.      The conspirators in the scheme planned or prepared at least 90 fraudulent applications, most of which were submitted. Based on the evidence investigators have reviewed

to date, CHS 2, Defendant, and their co-conspirators applied for PPP loans that are together worth more than $24 million dollars, with at least approximately 42 of those loans approved and funded for a total of approximately $17.4 million. Certain of those loan recipients then wired a kickback of varying amounts, often approximately 25% of the fraudulent loan proceeds, to an account controlled by CHS 2.

4.      I am a Special Agent with the United States Department of The Treasury, Internal Revenue Service, Criminal Investigation ("IRS-CI") and have been employed in this capacity since July 2002. I am presently assigned to the Miami Field Office. My duties as a Special Agent include the investigation of possible criminal violations of the Internal Revenue Code (Title 26 of the United States Code), the Bank Secrecy Act (Title 31 of the United States Code), and the Money Laundering Statutes (Title 18 of the United States Code). I graduated from the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in October 2002 and the Special Agent Investigative Techniques program at the National Criminal Investigation Training Academy in February 2003. In these two programs, I studied a variety of law enforcement tactics and criminal investigator techniques relating to tax and financial crimes. Since becoming an IRS-CI Special Agent, I have personally investigated and assisted in investigations relating to the Internal Revenue Laws and financial crimes. Recently, I have been assigned to work with the U.S. Department of Justice and other law enforcement partners, including the Federal Bureau of Investigation and the Small Business Administration Office of Inspector General, to investigate possible fraud associated with the stimulus and economic assistance programs created by the federal government in response to the COVID-19 pandemic.

5.      The facts in this Affidavit come from my personal observations, my training and experience, and information obtained from other members of law enforcement and from witnesses.

This Affidavit is intended to show merely that there is sufficient probable cause and does not set forth all of my knowledge about this matter.[1]

## PROBABLE CAUSE

### *The Paycheck Protection Program*

6.      The Coronavirus Aid, Relief, and Economic Security ("CARES") Act is a federal law enacted in or around March 2020 and designed to provide emergency financial assistance to the millions of Americans who are suffering the economic effects caused by the COVID-19 pandemic.  One source of relief provided by the CARES Act was the authorization of up to $349 billion in forgivable loans to small businesses for job retention and certain other expenses, through a program referred to as the PPP.  In or around April 2020, Congress authorized over $300 billion in additional PPP funding.

7.      In order to obtain a PPP loan, a qualifying business must submit a PPP loan application, which is signed by an authorized representative of the business.  The PPP loan application requires the business (through its authorized representative) to acknowledge the program rules and make certain affirmative certifications in order to be eligible to obtain the PPP loan.  In the PPP loan application, the small business (through its authorized representative) must state, among other things, its: (a) average monthly payroll expenses; and (b) number of employees.  These figures are used to calculate the amount of money the small business is eligible to receive under the PPP.  In addition, businesses applying for a PPP loan must provide documentation showing their payroll expenses.

---

[1]      The conduct and charges described in this Affidavit are part of a larger investigation that is being conducted in this District and elsewhere.  As a result, not all numbered sources and anonymous individuals and entities are described in every filing.  I have included in this Affidavit only those individuals and entities I have deemed necessary to explain the particular facts set forth here.

8.      A PPP loan application must be processed by a participating lender.  If a PPP loan application is approved, the participating lender funds the PPP loan using its own monies, which are 100% guaranteed by the Small Business Administration ("SBA").  Data from the application, including information about the borrower, the total amount of the loan, and the listed number of employees, is transmitted by the lender to the SBA in the course of processing the loan.

9.      PPP loan proceeds must be used by the business on certain permissible expenses— payroll costs, interest on mortgages, rent, and utilities.  The PPP allows the interest and principal on the PPP loan to be entirely forgiven if the business spends the loan proceeds on these expense items within a designated period of time after receiving the proceeds and uses a certain amount of the PPP loan proceeds on payroll expenses.

### *The Scheme to Obtain Fraudulent PPP Loans*

10.     On or about May 13, 2020, Phillip J. Augustin ("Augustin") and CHS 2 worked together to submit a fraudulent PPP loan application on behalf of a company owned by Augustin.  Augustin submitted a PPP loan of $84,515 to a federally insured bank (hereinafter "Bank 3"), through a third-party company processor (hereinafter "Bank Processor 1").[2]  The application included bank statements that are clear forgeries, and CHS 2 has admitted that the application was based on documents that he falsified for Augustin.[3]

---

[2]      All banks referenced in this Affidavit are insured by the Federal Deposit Insurance Corporation.

[3]      On June 25, 2020, investigators arrested CHS 2 and another person now cooperating with the investigation ("CHS 3") and executed search warrants at their residences.  Following his arrest, CHS 2 chose to cooperate with the investigation in the hope of obtaining favorable consideration in connection with his pending charges.  CHS 2 was interviewed on that day, and has continued to cooperate with the investigation after obtaining counsel.  Most of his statements related herein have been corroborated by records obtained from third parties or recovered from his electronic devices.

11.     Following the success of that initial fraudulent PPP application, Augustin and CHS 2 began to work on obtaining more and larger PPP loans for Augustin's associates and others, generally for several hundred thousand dollars for each loan, up to as much as approximately $1.24 million.   Based on the evidence investigators have reviewed so far, CHS 2 and Augustin collectively coordinated applications for PPP loans that are together worth more than $24 million dollars.  The evidence also shows many more PPP loans were attempted but rejected by banks or their partners, or were planned and prepared, but not submitted before CHS 2's arrest.   The evidence suggests that all or nearly all of those loan applications were fraudulent, including Defendant's loan applications.

12.     Investigators have obtained many other PPP loan applications that CHS 2 has admitted he submitted as part of this scheme, based on falsified documents, and have also obtained draft documents used or intended to be used in those applications or others.  These applications all follow the same pattern of fraud—many with obviously counterfeit February 2020 bank statements, and all with fabricated IRS Forms 941 (titled, "Employer's Quarterly Federal Tax Return") with the same indicia of fraud found in Augustin's initial application—but generally with even larger inflated payroll numbers, thus yielding much larger loans.[4]  CHS 2 has explained to investigators that the figures in the Forms 941 were the product of a formula that allowed him to start with a target loan amount, and then "back into" the payroll figures on the form.  He explained how he used figures that would produce an average monthly payroll for 2019 that, when multiplied by 2.5, would yield the requested loan amount.  In turn, the number of employees reported was

---

[4]     Some loan applications also included voided checks that appear to be falsified, such as a purported Bank 5 check that appears to have been produced on a computer and, as the subject line reads, "Converted to PDF," rather than a scan of an authentic check.

chosen based on fictional payroll figures, chosen to avoid an average employee salary that might raise suspicion.

13.     CHS 2 has also explained that he tried to use bank statements showing that the company had a large balance.  Because so few companies had such a statement, and likely also because it was easier than keeping track of their true statements, CHS 2 repeatedly submitted near-replicas of the same falsified bank statements.  In particular, CHS 2 appears to have recycled one statement each from Bank 1, Bank 6, and Bank 7.  In recycling a statement, CHS 2 generally changed only the account number and the account holder's name and address, such that each version of the statement had identical figures and line items throughout the statement.

14.     A review of records for bank accounts controlled by CHS 2 at Bank 5 confirm CHS 2's admissions that he received numerous kickbacks, often of approximately 25% of the amount of the loans, and that he regularly wired Augustin a share of that kickback in the early stages of the scheme.  CHS 2 explained that they were doing so many loans by the end of May that he changed course, instead wiring larger lump sums, collecting Augustin's shares of the kickbacks for multiple loans in one wire.

15.     Investigators are still receiving and analyzing records, but based on a preliminary analysis, as of August 31, 2020, investigators had identified a total of $2,367,765.82 in transfers to CHS 2's accounts from entities that each obtained a sizable PPP loan and that were identified in the PPP files seized from CHS 2's and another co-conspirator's residences, as described below—or from individuals associated with those entities.

16.     The PPP loans identified above as implicated in the foregoing kickback payments to CHS 2 represent only a fraction of the overall scheme.  In executing search warrants at the respective residences of CHS 2 and CHS 3, federal agents found stacks of paper printed out and

organized by entity, containing an "intake form," fabricated Forms 941, or both for each entity. The intake forms contained fields for the information needed to fabricate the documents and fill out other aspects of the PPP application: identifying information about the owner and company, as well as bank account information for receiving the loan. A section at the end marked "BELOW IS OFFICE USE ONLY" included blank fields for the "Number of Employees," "Monthly Payroll Expense," and "SBA Loan Pre-Approval Amount." Between CHS 2's and CHS 3's residences, investigators seized paper files for PPP loan applications for approximately 80 different entities.

17.     Data obtained from the SBA showed additional PPP loan applications from additional entities that text message and email records show had been referred to CHS 2 by members of the conspiracy.

### The Fraudulent PPP Loan to Throwbackjerseys.com

18.     According to Florida's Division of Corporations website ("Sunbiz"), Throwbackjerseys.com was incorporated in or around April of 2018. SMITH is listed as the company's manager and registered agent. The address listed on Sunbiz for Throwbackjerseys.com is 7958 Pines Blvd, PMB 453, Pembroke Pines, FL 33024. Investigators visited this address and were unable to find any business named "Throwbackjerseys.com" at that location. Rather, that address appears to be merely a mailbox at "Discount Postal & Business Center," a shipping and mailing store. The web address "Throwbackjerseys.com" does not lead to an operating website on the internet. According to bank records, on or about June 3, 2019, SMITH opened a business checking account in the name of Throwbackjerseys.com and was the sole signatory on the account.

19.     On or about May 17, 2020, a PPP loan application and supporting documents on behalf of Throwbackjerseys.com were electronically submitted to Bank 3 through Bank Processor 1. The supporting documents included, among other documents: (1) purported Forms 941 for all

four quarters of 2019 in the name of the company; (2) a company bank statement; (3) an application form; and (4) a promissory note.

20.     The purported Forms 941 for Throwbackjerseys.com included in the application show quarterly payroll of more than $500,000 each quarter, for 20 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $170,687, which determined the $426,717 amount of the loan. Each was signed by hand with the name "Diamond Smith" as the company owner, and also listed SMITH as the company's designee and as a "Paid Preparer," though he is not a paid tax preparer. The Throwbackjerseys.com Forms 941 follow the same style and pattern as the many other Forms 941 that CHS 2 described above, acknowledged that he helped create and submit in the course of the scheme, including in the indicia of fraud.[5] IRS records show that Throwbackjerseys.com did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that Throwbackjerseys.com did not report any wages or employees for that same period.

21.     The purported company bank statement, which was submitted in electronic format, is a clear forgery. First, Throwbackjerseys.com does not have its business account at the bank

---

[5]     As noted above, SMITH was listed as both owner and paid preparer. Dozens of other Forms 941 submitted in this scheme evidence the same error. CHS 2 has admitted that these documents share that feature because he misunderstood the form, and he (or someone following his instructions) prepared all of the Forms 941 at issue. The content of the forms also indicate falsification. All four quarterly forms are nearly identical, and the four forms for Throwbackjerseys.com are identical, down to the penny, in reported figures. They also evidence a pattern of payroll spending that is likely false: each of the quarters shows significant increases from the first to second to third month of the quarter. For each identical form, the same figures are reported for the tax liability incurred in the first month of each quarter, the same figure for the second month of each quarter (increased substantially from the first month), and the same figure for the third month of the quarter (increased substantially from the second month). The result is that the company reports a perfectly repeating cycle of ascending payroll costs within each quarter. CHS 2 has explained that this was due to a formula he used, allocating different percentages of the quarterly payroll tax liability to each month of each quarter.

from which the statement was purportedly drawn.   Second, according to the document's file "properties," the statement was created using "PDFFILLER," a program used to edit electronic PDF files, and it was "modified using iText."   Third, the statement is a recycled version of the same falsified Bank 6 statement used in other fraudulent applications submitted as part of this scheme.

22.     The PPP loan application form, labeled at the top "Payment Protection Program Borrower Application Form," listed SMITH as the owner of Throwbackjerseys.com, claimed the company had 21 employees, and stated that the average monthly payroll was $170,687.   Based on this figure, the amount of the PPP loan request was $426,717.   The application form required the borrower to electronically initial a number of "certifications," including: (1) that the applicant was in operation on February 15, 2020 and had employees to whom it paid salaries/payroll taxes or paid independent contractors, as reported on Form(s) 1099; (2) that the funds would be used to retain workers, maintain payroll, or make mortgage/interest/lease/utility payments as specified by the PPP rule and that unauthorized use could result in charges for fraud; and (3) that the information provided in the application, including in supporting documents, was "true and accurate in all material respects," and that making false statements could result in criminal charges.   The application was electronically signed using SMITH's initials "DBS," which appears similar to SMITH's signature in Florida's Driver and Vehicle Information Database ("DAVID").   Each certification was electronically initialed "DBS" as well.

23.     The promissory note, labeled at the top "Paycheck Protection Program Loan," set forth the amount of the loan ($426,717) and its terms (including that the proceeds could only be used for business purposes).   The terms also specified that the borrower may apply for loan forgiveness only in an amount equal to the sum of certain specified costs: payroll costs, interest on

mortgage obligations, rent obligations, and utility payments. The promissory note further specified that not more than 25% of the amount of forgiveness can be attributable to non-payroll costs. Additionally, the promissory note contained a "Representations and Warranties" section for the borrower to acknowledge, among other things that "the information provided in all supporting documents and forms to obtain this loan" were true and accurate. The promissory note was electronically signed with SMITH's initials "DBS," which appears similar to the signature in the loan application form and in DAVID.

24.     Bank Processor 1's Internet Protocol ("IP") records for the Throwbackjerseys.com loan application show that a computer with an IP address (ending in 170) associated with CHS 2's residence in Broward County, Florida, logged into the Throwbackjerseys.com loan account as early as May 17, 2020. The session records also reveal subsequent logins by one or more mobile devices whose IP addresses logged into the Throwbackjerseys.com loan account on May 18, 2020, and May 19, 2020. Bank records show that mobile device(s) using the same IP addresses (ending in 61, 166, 195 and 196) also accessed the Throwbackjerseys.com bank account on May 18, 2020, and May 19, 2020. Records received from DocuSign indicate that the loan application and promissory note were signed on May 18, 2020 at 11:58 a.m. (PST) via a mobile device using IP address ending in 61.[6] Likewise, the records from Bank Processor 1 indicate that the borrower

---

[6]     The DocuSign records reflect that the electronic signatures adopted for both loans were "drawn on device," which indicates that the adopted signatures were manually drawn by the signer. The other option available would have been to select one of the predefined styles from the DocuSign program, which would then populate the signature line with the "pre-selected style." As mentioned above in Paragraphs 22 and 23, the DocuSign signature on the loan application and promissory note for Throwbackjerseys.com appears to match SMITH's DAVID signature. By contrast, as discussed in Paragraphs 31 and 32 below, the DocuSign signature on the loan application and promissory note for Blue Star Records does not appear to match the DAVID signature of Person 53.

approved the loan documents via DocuSign on May 18, 2020 at 11:58 a.m. (PST) using a mobile device with IP address ending in 61.

25.      Based on the representations made in the loan application paperwork and supporting documents, the PPP loan application for Throwbackjerseys.com was approved, and on or about May 20, 2020, Bank 3 wired approximately $426,717 in loan proceeds into the Throwbackjerseys.com bank account.

### *The Fraudulent PPP Loan to Blue Star Records*

26.      According to Sunbiz, Blue Star Records was incorporated in or around December of 2012, with SMITH listed as the registered agent and manager.  On May 21, 2020, one day after the PPP loan amount was wired to the Throwbackjerseys.com's account, an annual report was filed in Sunbiz for Blue Star Records that added Person 53 as a manager.  As discussed below, text communication between SMITH and CHS 2 revealed that SMITH was the true owner of Blue Star Records and that Person 53 was SMITH's mother.

27.      The address listed in Sunbiz for Blue Star Records is 4011 N.W. 194th Street, Miami Gardens, FL 33056.  Investigators visited this address and were unable to find any business named "Blue Star Records" at that location.  What they found instead was a single-family residence in a residential neighborhood.  According to bank records, on or about April 5, 2013, SMITH and another individual opened a business checking account in the name of Blue Star Records.  Starting on February 25, 2019, SMITH became the sole signatory on the Blue Star Records account.  The bank records I have reviewed for Blue Star Records indicate that Person 53 was never added to the Blue Star Records account.

28.      On May 21, 2020, the day on which Person 53 was added as a manager of Blue Star Records in Sunbiz, a PPP loan application and supporting documents on behalf of Blue Star Records were electronically submitted to Bank 3 through Bank Processor 1.  The supporting

documents included, among other documents: (1) purported Forms 941 for all four quarters of 2019 in the name of the company; (2) a company bank statement; (3) an application form; and (4) a promissory note.

29.     The purported Forms 941 for Blue Star Records included in the application show quarterly payroll of more than $800,000 each quarter, for 35 employees. That quarterly payroll figure yielded the PPP loan application's "Average Monthly Payroll" figure of $283,226, which determined the $708,065 amount of the loan. Each Form 941 was signed by hand with the name of Person 53 as the company owner. Like the Throwbackjerseys.com Forms 941, these Forms 941 also listed Person 53 as the company's designee and as a "Paid Preparer," though she is not a paid tax preparer. The Blue Star Records Forms 941 follow the same style and pattern as the many other Forms 941 that CHS 2 helped create and submit in the course of the scheme, including in the indicia of fraud discussed in note 5 above. IRS records show that Blue Star Records did not, in fact, file any Forms 941 for any quarter of 2019 or the first quarter of 2020, and Florida Department of Revenue records show that Blue Star Records did not report any wages or employees for that same period.

30.     As was the case with Throwbackjerseys.com's bank statement, the purported bank statement for Blue Star Records, which was submitted in electronic format, is a clear forgery. First, Blue Star Records does not have its business account at the bank from which the statement was purportedly drawn. Second, according to the document's file "properties," the statement was created using "PDFFILLER," a program used to edit electronic PDF files, and it was "modified using iText." Third, the statement is a recycled version of the same falsified Bank 1 statement used in other fraudulent applications submitted as part of this scheme.

31.     The application form for Blue Star Records listed Person 53 as the owner of Blue Star Records, claimed the company had 35 employees, and stated that the average monthly payroll was $283,226.  Based on this figure, the amount of the PPP loan request was $708,065.  The application form required the borrower to electronically initial a number of "certifications," as previously described with respect to the application of Throwbackjerseys.com. The application was electronically signed with a signature that does not appear to match Person 53's Florida DAVID signature.  Each certification was electronically initialed with what appear to be the letters "DB," which differ from the initials of Person 53.

32.     The promissory note, labeled at the top "Paycheck Protection Program Loan," set forth the amount of the loan ($708,065) and its terms (including that the proceeds could only be used for business purposes).  The promissory note contained the same terms previously described with respect to the promissory note for Throwbackjerseys.com.   The promissory note was electronically signed with the same signature reflected in the application form.

33.     Bank Processor 1's IP records for the Blue Star Records loan application show that the IP address (ending in 170) associated with CHS 2's residence logged into the Blue Star Records loan account starting on May 21, 2020.  The session records also reveal subsequent logins by one or more mobile devices whose IP addresses logged into the Blue Star Records loan account on May 21, 2020, and May 22, 2020.  Bank records show that the mobile device(s) with some of the same IP addresses (ending in 50 and 204) also accessed the Throwbackjerseys.com bank account on May 21, 2020, and May 22, 2020, and the Blue Star Records/SMITH bank accounts on May 22, 2020.

34.     Based on the representations made in the loan application paperwork and supporting documents, the PPP loan application for Blue Star Records was approved, and on or

about May 26, 2020, Bank 3 wired approximately $708,065 in loan proceeds into the Blue Star Records bank account.

### *CHS 2 Confirmed to Law Enforcement that the Throwbackjerseys.com and Blue Star Records PPP Loans Were Fraudulent and that SMITH Referred Others to the Scheme*

35.     Investigators spoke with CHS 2 about SMITH and the PPP loans to Throwbackjerseys.com and Blue Star Records.  CHS 2 stated that he met SMITH through Augustin.  According to CHS 2, the three of them met in person and discussed a PPP loan for SMITH and the 25% kickback payments that SMITH would pay CHS 2 and Augustin out of the loan amount.  According to CHS 2, SMITH initially requested a one million dollar PPP loan, but CHS 2 convinced him to keep the loan below $500,000.  SMITH agreed to pay CHS 2 and Augustin a kickback, but he obtained from CHS 2 an agreement in return that CHS 2 would prepare additional paperwork to help repair SMITH's credit.

36.     CHS 2 stated that he helped SMITH apply for a PPP loan for his company, Throwbackjerseys.com.  According to CHS 2, once SMITH was approved for the first PPP loan, SMITH provided him information about Blue Star Records, advised CHS 2 that it was SMITH's company, and indicated the amount he wanted CHS 2 to request for a second PPP loan.  According to CHS 2, he explained to SMITH that he could only be awarded one PPP loan in his name.  CHS 2 stated that SMITH told him Person 53 was his mother, and that, at SMITH's request, CHS 2 added her to Blue Star Records in Sunbiz so that SMITH could apply for a second PPP loan.

37.     As to the Throwbackjerseys.com and Blue Star Records PPP loans, CHS 2 confirmed that the loan applications were fraudulent and stated that he had assisted SMITH in preparing and submitting them.  CHS 2 stated that he: (1) created for SMITH an online account for Throwbackjerseys.com and Blue Star Records with Bank Processor 1; (2) created and submitted a fake bank statement for Throwbackjerseys.com and Blue Star Records; and (3)

created, submitted, and signed (on behalf of SMITH), the false Forms 941. According to CHS 2, he did not sign the application form or promissory note for either Throwbackjerseys.com or Blue Star Records.

38.     CHS 2 also stated that, in addition to Throwbackjerseys.com and Blue Star Records, SMITH referred to him two additional friends/associates for the purpose of creating and submitting additional fraudulent PPP loans. As stated above, CHS 2 and Augustin would share a 25% kickback for these referrals. CHS 2 said he advised SMITH that he would receive a 5% share of the loan payout for his referrals. According to CHS 2, he acted on the first referral that SMITH submitted to him, but did nothing regarding the second one because SMITH sought to renegotiate the kickback amount he would be owed vis-a-vis CHS 2 and Augustin's share.

### *Emails and Text Messages Confirm SMITH's Knowing Participation in the Fraud*

39.     As part of its investigation, law enforcement obtained communications between CHS 2 and SMITH, including text messages and emails. I have reviewed a number of these communications, which discuss, among other things, SMITH's PPP loans and the loans for the friends/associates he referred to CHS 2.

40.     For example, on or about May 17, 2020, Augustin sent CHS 2 a text message with the information for Throwbackjerseys.com's PPP loan application, including the company's bank account number, EIN tax ID number, and SMITH's cell phone number. That same day, CHS 2 sent a text message to SMITH that stated: "Hi please call me working on your sba file."

41.     The next day, May 18, 2020, SMITH sent a text to CHS 2 stating, "I was able to log in." CHS 2 asked SMITH, "You activated the account?" According to CHS 2, and consistent with information obtained from Bank Processor 1 regarding the application process, after CHS 2 created SMITH's account to apply for a PPP loan on Bank Processor 1's website, SMITH would

have received an email from Bank Processor 1, and upon accessing that email, SMITH would need to activate the account. SMITH responded in two consecutive text messages, "I think so, but it says there are more tasks" and "should I complete those tasks?" CHS 2 responded, "Yes I have to add documents now p[l]ease send me the new password" and "No you can't I have the docs." According to CHS 2, this was the step in the application process at which he would upload the Forms 941 for the borrower. SMITH advised CHS 2 that the password was the same and then restated the steps he had taken: "when I clicked the activate button, I was asked to log in, that was it, then it asked me to 'see tasks' to complete which is uploading documents." CHS 2 answered that he "would take care of that in the am."

42.     Later that day, May 18, 2020, SMITH texted CHS 2 notifying him that "they sent email and asked me to accept loan. says I was approved." That same night, SMITH sent a text to CHS 2 with a screenshot of a message from Bank Processor 1 stating, "Thank you for accepting your offer for the Paycheck Protection Program. We've initiated an ACH deposit into the bank account you provided in your application ...." CHS 2 explained that the notification from Bank Processor 1 thanking the borrower for accepting the offer occurs after the borrower signs the loan application and promissory note.

43.     In the same minute that SMITH sent CHS 2 the screenshot from Bank Processor 1, SMITH sent CHS 2 a text message about Blue Star Records with its bank account number and EIN tax ID number. Two minutes later, SMITH texted CHS 2 with Blue Star Records' address and SMITH's name as its owner. On May 21, 2020, SMITH followed-up by sending CHS 2 a text message asking, "what is the info you needed for bluestar." CHS 2 responded by asking, "is that your company bluestar" and SMITH answered, "yes." CHS 2's phone reflects that SMITH called him twice, after which SMITH sent CHS 2 another text message, saying: "name to add to Blue

Star Records llc (Sunbiz.org)" and included the name of Person 53, her social security number, home address and email address.  CHS 2 then requested more information: "need your moms date of birth.  I need an email that is good And I need business start date." SMITH texted CHS 2 with Person 53's date of birth, her email address once again, and the start date for Blue Star Records.

44.     On May 22, 2020, CHS 2 sent SMITH a text message with the following instructions: "check email for your company activate use email as user and the password is [redacted] all lower case."  CHS 2 explained that this was the point at which SMITH needed to open the email from Bank Processor 1 and activate the account CHS 2 created for the Blue Star Records PPP loan application process.

45.     On May 26, 2020, SMITH sent CHS 2 a text message letting him know he had sent him "$50,000" and would "send another wire tomorrow and day after." On May 29, 2020, SMITH alerted CHS 2 via text that he had wired him another $50,000, and wrote, "so that's $140,000," which was approximately 20% of the PPP loan amount he received for Blue Star Records.  SMITH then sent CHS 2 a text message stating, "ok now I need you to make me some money and I still don't have a car." SMITH followed that text message with another one that included a website for the sale of a used Lamborghini Aventador.

46.     During my review of SMITH's communications with CHS 2, I found what appears to be information pertaining to PPP loan referrals for two other companies.  On May 20, 2020, SMITH sent a text message to CHS 2 and provided a company name, date of incorporation, EIN tax ID number, its address, bank account number, the name of the individual associated with the company, email address, and phone number.  Later that day, CHS 2 responded with a text asking SMITH for the individual's social security number, date of birth, home address and for

confirmation of the email address SMITH had provided. SMITH responded on May 21, 2020, with a text message that contained the information CHS 2 had requested.

47.     On June 4, 2020, SMITH sent CHS 2 a text message about "another client" and attached a hand-written note about another individual, Person 54, and the associated company containing the same detailed information that CHS 2 had previously requested for the other loan applications. Miami-Dade County's marriage license bureau shows that Person 54 is married to Person 53 and is SMITH's step-father. According to Sunbiz, Person 54's company was inactive until a reinstatement was filed with Sunbiz on June 1, 2020. On June 5, 2020, SMITH followed up with CHS 2, and sought to remind him, "so this is my second referral." Further investigation, including review of data collected from Bank Processor 1, suggests that a PPP loan application was initiated for the first entity that SMITH referred, but the application process was not completed.

### *SMITH's Banking Activity Confirms His Knowing Participation in the Fraud*

48.     I have also reviewed the bank records for Throwbackjerseys.com, Blue Star Records, SMITH and CHS 2, which confirm SMITH's receipt of the PPP loan proceeds. Specifically, on or about May 20, 2020, Bank 3 wired the loan amount, $426,717, into the Throwbackjerseys.com account. As of May 1, 2020, the Throwbackjerseys.com account had a balance of $642.57, and before the PPP loan amount arrived on May 20th, the account balance was down to $218.68. The bank statements also indicate that as of May 2020, the account had been charged $910 in overdraft fees for the year. Upon receiving the PPP loan amount on May 20, 2020, SMITH wired $90,000 to CHS 2's account, which is approximately 21% of the loan amount. On May 22, 2020, SMITH wired $214,000 to the Blue Star Records account and transferred another $5,000 to his personal account. There were transfers made to several individuals after the loan was received, but based on my training and experience, these do not resemble salary

payments, as they were multi-thousand dollar, rounded-number payments that were not repeated in June.  By August 3, 2020, the Throwbackjerseys.com account had a zero balance.

49.     On or about May 26, 2020, Bank 3 wired the loan amount of $708,065 into the Blue Star Records account.  The account had a zero balance to start the month of May, which grew to $13,100 before the account received $214,000 from the Throwbackjerseys.com account on May 22, 2020.  Between May 26, 2020 and May 29, 2020, SMITH made three wire payments to one of CHS 2's accounts, totaling $140,000, and on May 26, 2020, he made a separate $10,000 payment directly to Augustin.  The payments totaling $150,000, are approximately 21% of the loan amount.

50.     Between May 26, 2020 and May 27, 2020, SMITH transferred $1,036,667.08 from the Blue Star Records account to his personal account.  SMITH's personal account had a balance of $1,021.97 as of May 14, 2020.  Between May 26, 2020 and May 29, 2020, SMITH transferred $294,453.79 from his personal account back to the Blue Star Records account, resulting in a net transfer to his personal account of $742,213.  In June, SMITH had a net transfer of another $245,040.07 to the Blue Star Records account from his personal account.  By June 30, 2020, the ending balance for the Blue star Records account was -$600.02.  On July 13, 2020, the ending balance on SMITH's personal account was zero.  In all, following SMITH's receipt of the PPP loan proceeds, his net transfers from the Throwbackjerseys.com and Blue Star Records accounts to his personal account totaled approximately $502,173.

51.     Bank records show what appear to be purchases of luxury items and personal expenses using loan proceeds.  For example, between June 22, 2020 and July 6, 2020, SMITH spent approximately $27,176 at the Seminole Hard Rock Hotel and Casino.  On June 24, 2020, and July 2, 2020, SMITH purchased $2,290 in goods at Versace.  In addition, bank records show that SMITH withdrew approximately $271,805 between May 26, 2020 and August 3, 2020.

52.     Records from the Blue Star Records account show that a check dated June 9, 2020, bearing SMITH's signature was issued from the Blue Star Records account to Person 55 in the amount of $96,000, with a note indicating it was a "company vehicle payment."  On four separate occasions in September 2020, investigators have observed a black Ferrari parked at SMITH's residence.  The Ferrari has a temporary tag registered to a company owned by Person 55.

<strong><u>CONCLUSION</u></strong>

53.     Based on the forgoing, I respectfully submit that there is probable cause to believe that DIAMOND BLUE SMITH committed the Target Offenses.

FURTHER YOUR AFFIANT SAYETH NAUGHT.

Warren E. Rogers, Jr.
Special Agent
IRS-CI             ID #6335

Attested to by the applicant in accordance
with the requirements of Fed. R. Crim. P. 4.1
by telephone on this **30** Day of September, 2020

HONORABLE EDWIN G. TORRES
UNITED STATES MAGISTRATE JUDGE